David A. Picon (DP-6762)
Bruce E. Fader (not admitted to District of New Jersey)
Peter J.W. Sherwin (admission *pro hac vice* pending)
Jordan B. Leader (admission *pro hac vice* pending)
PROSKAUER ROSE LLP
One Newark Center
Newark, New Jersey 07102
(973) 274-3200
1585 Broadway
New York, New York 10036
(212) 969-3000
*Attorneys for Petitioners*

RECEIVED
SEP 0 8 2009
AT 8:30_____M
WILLIAM T. WALSH
CLERK

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| A. Nattermann & Cie GmbH and May & Baker Limited, <br><br> Petitioners, <br><br> v. <br><br> R&D Ferrlecit Capital Resources, Inc., <br><br> Respondent. | Civil Action No.: 09-3929 |

### ~~PROPOSED~~ JUDGMENT

Upon consideration of the Petition of A. Nattermann & Cie GmbH and May & Baker Limited ("Petitioners") to recognize, confirm, and enforce the final, binding foreign arbitration award dated May 18, 2009 made by the Court of Arbitration of the Zurich Chamber of Commerce, in Zurich, Switzerland (the "Final Award"), the Memorandum of Law in support thereof, the Declaration of Peter J.W. Sherwin in support thereof, and the exhibits attached thereto, with proof of due service thereof upon Respondent R&D Ferrlecit Capital Resources, Inc. ("Watson"), and with no responsive papers filed by Respondent, after due deliberation this Court, on this 8th day of Sept, 2009,

1

ORDERS, that the Petition for Recognition, Confirmation and Enforcement of a Final, Binding Foreign Arbitration Award is GRANTED,

ORDERS that the Final Award, issued on May 18, 2009 is confirmed, recognized and enforced in its entirety; and

IT IS FURTHER ORDERED THAT THIS COURT:

1. DECLARES that for the purpose of this Judgment, the following terms have the following meanings:

   a. "Claimants" means individually and collectively A. Nattermann & Cie. GmbH (for itself and as successor in interest to Rhône-Poulenc Rorer GmbH) and May & Baker Limited (as successor in interest to Rhône-Poulenc Rorer Ltd.);

   b. "Respondent" means R&D Ferrlecit Capital Resources, Inc. (as successor in interest to Makoff R&D Laboratories, Inc., doing business as R&D Laboratories, Inc.);

   c. As to Respondent, "Affiliates" means individually and collectively (i) Watson Pharmaceuticals, Inc., (ii) Watson Pharma, Inc. (formerly named Schein Pharmaceutical, Inc.), (iii) Makoff R&D Laboratories, Inc., (iv) any entity which is directly or indirectly controlled by Respondent, (v) any entity which directly or indirectly controls Respondent, and (vi) any entity which is under common control with Respondent. As to Claimants, "Affiliates" means individually and collectively (i) any entity which is directly or indirectly controlled by Claimants, (v) any entity which directly or indirectly controls Claimants, and (vi) any entity which is under common control with Claimants. For purposes of this definition, "control" shall mean ownership of greater than 50% of the voting stock or other voting interests in the entity in question;

   d. "Distribution Agreement" means the Distribution Agreement dated June 24, 1993, between Rhône-Poulenc Rorer GmbH, on the one hand, and Makoff R&D Laboratories, Inc., doing business as R&D Laboratories, Inc., on the other hand, as amended;

   e. "Trademark Agreement" means the Trademark Agreement dated August 26, 1993, entered into between Rhône-Poulenc Rorer GmbH and A. Nattermann & Cie. GmbH, on the one hand, and Makoff R&D Laboratories, Inc., doing business as R&D Laboratories, Inc., on the other hand, as amended;

  f.  "MSA" means the Manufacturing and Supply Agreement dated as of December 1, 1998, between Rhône-Poulenc Rorer Ltd. and Rhône-Poulenc Rorer GmbH, on the one hand, and Makoff R&D Laboratories, Inc., doing business as R&D Laboratories, Inc., on the other hand, as amended; and

  g.  "Ferrlecit Agreements" means individually and collectively the Distribution Agreement, the Trademark Agreement, and the MSA.

2.  DECLARES that the Ferrlecit Agreements expire on December 31, 2009, and, consequently, decides to dismiss Claimants' claim for a declaration that the Ferrlecit Agreements expired on February 18, 2009.

3.  DECLARES that, as a consequence of the declaration in paragraph 2 above, Claimants' claim for disgorgement of Respondent's net profits for sales of Ferrlecit made between February 19, 2009 and July 1, 2009 has become moot.

4.  ORDERS Respondent to provide or cause to be provided to Claimants at no cost all of the following information, which Claimants may use free of charge in perpetuity in the United States and Canada to sell or market Ferrlecit:

  a.  Health Registrations: The entirety of each health registration for Ferrlecit in the United States and Canada (and in Greece, Argentina, Chile, Mexico, United Kingdom, Ireland, Japan and Singapore, to the extent existing), including but not limited to:

    i.  NDA: The New Drug Application in the United States ("NDA"), with all amendments and supplements thereto;

    ii.  NDS: The New Drug Submission in Canada ("NDS"), with all amendments and supplements thereto; and

    iii.  IND: The Investigational New Drug Application in the United States ("IND"), with all amendments and supplements thereto;

  b.  Government Correspondence: Without limiting subparagraph (a) above, all notices and correspondence to or from the FDA or Health Canada (or the applicable regulatory agency in Greece, Argentina Chile, Mexico, United Kingdom, Ireland, Japan and Singapore) regarding any health registration for Ferrlecit, including:

    i.  Any notices or correspondence regarding current, pending or threatened violations, actions (including warning letters), regulatory investigations, or governmental proceedings, to the extent existing;

    ii.  All non-public regulatory correspondence;

    iii. All post-marketing reports (including but not limited to annual reports, field alerts, periodic safety reports, 15 day safety reports, and any individualized reporting requirements mandated by FDA or Health Canada with respect to Ferrlecit);

    iv. Current FDA (and Health Canada) guidance on safety related to Ferrlecit or FDA (or Health Canada) commitments, together with any regulatory responses or communications regarding any such safety guidance or commitments, to the extent existing and non-public;

    v. Communications with the FDA Division of Drug Marketing, Advertising, and Communications (and any Canadian equivalent) concerning Ferrlecit, and all related documents, to the extent existing and nonpublic; and

    vi. Any current/past regulatory responses to any new guidance for Product safety (REMS), to the extent existing;

  c. Safety Documentation: Any non-public documentation specifically related to safety for Ferrlecit, including but not limited to voluntary and mandatory "MedWatch reporting forms," "core data sheets," core data sheet communications, and letters to physicians, in each case to the extent they exist. For the purpose of this paragraph 4(c), "MedWatch reporting forms" means intake forms completed during the receipt of a product complaint or other pharmacovigilance call or filed with the FDA which document the call and the issues discussed, and "core data sheets" means documents prepared by the marketing authorization holder containing, in addition to safety information, material relating to indications, dosing, pharmacology, and other information concerning the product.

  d. Clinical Trials: Copies of all ongoing and completed clinical trials and all documents reasonably related and useful thereto, including SAS data sets, study reports, and publications by Respondent or its Affiliates;

  e. Pharmacovigilance: Copies of pharmacovigilance reporting and related documentation;

  f. Post-Marketing Commitments: Copies of any and all information data, and work product produced in response to outstanding postmarketing commitments (including all information concerning the postmarketing commitment referenced in CX 63);

  g. Post-transfer Documents: Post-transfer information relating to pretransfer sales of Ferrlecit that would be part of post-marketing reporting requirements to the FDA or Health Canada;

  h. MIS Communications: Standardized medical communication letters;

4

   i. Quality Complaints: Copies of complaints from third-parties regarding Ferrlecit; and

   j. Labeling: Labeling history and artwork files, including but not limited to the Structured Product Labeling, to the extent not already provided.

No such documents will be withheld from production, however, on the basis that they are publicly available if they are regularly maintained by Respondent or its Affiliates in the Ferrlecit health registration files.

To the extent not already provided prior to May 4, 2009, all of the foregoing shall be provided (or shall have been provided) by no later than May 4, 2009. To the extent information falling within any of the foregoing categories does not exist as of May 4, 2009, it shall be provided on a rolling basis at least within two weeks of being sent, received, or obtained.

To the extent any of the information in subparagraphs (c), (e), or (i) above is requested or required to be filed with a governmental regulatory agency anywhere in the world, Claimants and their Affiliates may do so.

  5. ORDERS Respondent, at no cost to Claimants, to transfer or cause to be transferred to Claimants ownership of all health registrations for Ferrlecit in the United States, Canada, Greece, Argentina, Chile, Mexico, United Kingdom, Ireland, Japan and Singapore, to the extent existing, as of January 1, 2010, and, as part of that transfer, Respondent shall write each applicable regulatory agency by no later than six weeks prior to date of transfer of ownership of the Ferrlecit health registrations, with a copy simultaneously sent to Claimants, stating the transfer of ownership of all health registrations as of that date and Claimants shall simultaneously send a letter to each applicable regulatory agency acknowledging the change of ownership. Except as requested by FDA of Health Canada, Respondent shall not, and shall cause its Affiliates not to, substantively change or alter the Ferrlecit health registrations prior to transfer of ownership, absent prior written consent of Claimants not to be unreasonably withheld or delayed.

  6. DECLARES that the manufacturing process for Ferrlecit is entirely the property of Claimants and constitutes RPR know how as that term is used in the Distribution Agreement, and Respondent has no ownership interest or use right in any part of the Ferrlecit manufacturing process. Respondent shall not, and shall cause its Affiliates not to, use, sell, disclose, license, or otherwise dispose of the Ferrlecit manufacturing process or any part or aspect thereof, including but not limited to the information in the CMC section of the NDA for Ferrlecit. The Ferrlecit molecular weight GPC test method and general manufacturing know how not confidential or proprietary to Claimants or their Affiliates is not part of the manufacturing process for Ferrlecit and is not addressed by this paragraph. Respondent represents that neither it nor any of its Affiliates has, without Claimants' or their Affiliates' knowledge, disclosed any part of the Ferrlecit manufacturing process to anyone other than a regulatory agency or a third party on a confidential basis in connection with such third party's evaluation of potential contract manufacturing of Ferrlecit. For the avoidance of doubt, Respondent and its Affiliates have not disclosed any part of the Ferrlecit manufacturing process to a third party for the purpose of

developing or manufacturing a product that would compete with Ferrlecit. Respondent shall use reasonable efforts to destroy all originals and copies of all documents, howsoever maintained by it or any of its Affiliates, concerning or regarding the Ferrlecit manufacturing process, provided that Respondent shall not be required to destroy electronic copies of documents maintained in accordance with Respondent's and its Affiliates' ordinary data archiving and data recovery policies and practices.

7. ORDERS Respondent, until the date of transfer of ownership of the Ferrlecit health registrations to Claimants, to cause Ferrlecit to continue to be marketed and sold in the United States and Canada in the ordinary course and shall continue to use commercially reasonable efforts to market and sell Ferrlecit and shall not, and shall cause its Affiliates not to, engage in a program to switch customers or patients to a competing product for the labeled indication of Ferrlecit, or sell quantities materially larger than historically usual, all absent prior written consent of Claimants.

8. ORDERS Claimants to provide Respondent with additional inventory of Ferrlecit only to the extent that Respondent provides them with reasonable documentation (a) from a customer that requests additional Ferrlecit inventory demonstrating that the customer's then-current inventory levels will be insufficient to maintain its customary inventory level (which generally is approximately a 4-week supply) until the expiration of the Ferrlecit Agreements and (b) from Respondent demonstrating that it and its Affiliates have insufficient inventory of Ferrlecit to satisfy such customer's request without putting at risk Respondent's and its Affiliates' ability to satisfy ordinary customer demand for Ferrlecit until the expiration of the Ferrlecit Agreements.

9. ORDERS Respondent, upon the expiration of the Ferrlecit Agreements, to promptly destroy and cause to be destroyed all remaining Product inventory owned, possessed or controlled by it or any of its Affiliates and shall promptly provide Claimants with a certification that such has occurred, the foregoing absent an agreement with Claimants for the repurchase of such inventory.

10. DECLARES that Respondent and its Affiliates have the right to continue to sell INFeD and the right to sell any product competing with Ferrlecit and may use the employees of the "Ferrlecit Division" to do so.

11. ORDERS Respondent, without limiting the obligations under paragraph 6 above or the parties' obligations under the Distribution Agreement, and except as otherwise provided herein, to, and to cause its Affiliates to, maintain as confidential and not disclose to a non-Affiliate (other than as required by law or by the rules and regulations of the exchange on which their securities are traded) any and all Non-public Commercial R&D Know how (as defined below) for a period of five years after the expiration of the Distribution Agreement, provided that Respondent and its Affiliates shall not be prohibited from disclosing the Non-public Commercial R&D Know how to the extent it comes within the scope of the exception set forth in paragraph 9.5(a) or (d) of the Distribution Agreement. For the avoidance of doubt, general knowledge and expertise concerning the marketing and sale of intravenous iron products, including Ferrlecit, is deemed public information. For the purposes of this paragraph, "Non-public Commercial R&D

Know how" means the following information related to Ferrlecit possessed by Respondent or its Affiliates as of the date of transfer of ownership of the Ferrlecit health registrations:

    i. Any non-public government price reporting information, including for example reports for "Best Price," Federal Supply Schedules (FSS) and Public Health Service (PHS);

    ii. Average Sales Price (ASP) calculations files submitted to Centers for Medicare and Medicaid Services (CMS) in last nine months (provided that when such information is published by CMS it shall be public information);

    iii. Current contracts with any customers, including for example physicians, hospitals, clinics, pharmacies, wholesalers and distributors, to the extent related to Ferrlecit;

    iv. Summary of gross sales and units sold for the last 24 months;

    v. Records indicating results of calls made to targeted Nephrologists in last 12 months;

    vi. Records indicating purchases made by and rebates provided to each individual customer in last 12 months, to the extent related to Ferrlecit;

    vii. Summary of focus group activities for Ferrlecit, to the extent not publicly available;

    viii. Identification of each grant that has been issued relating to Ferrlecit, to the extent not publicly reported, and information identifying those grants for which there is a continuing obligation for payment;

    ix. Product market research (including positioning, segmentation, pricing, user-non user, campaign and message development, and message tracking);

    x. Forecasts created in the last 12 months; and

    xi. Brand, tactical and marketing plans created in the last 12 months.

12. DECLARES that the following is the property of Respondent and constitutes R&D know how as that term is used in the Distribution Agreement, and Respondent and its Affiliates are free to use and/or dispose of any of it in any manner they deem appropriate, all of the foregoing provided, however, that Claimants and their Affiliates may use the following R&D Know how worldwide in perpetuity without charge, including in connection with contract manufacturing of Ferrlecit by a third party provided the third party maintains it as confidential:

– the Ferrlecit Pediatric Study, FR01006;

7

Case 3:09-cv-03929-JAP-LHG   Document 3-3   Filed 08/06/2009   Page 8 of 8

– the Ferrlecit molecular weight GPC test method; and

– the Ferrlecit laser light scattering method No. DM-0168-00.

13. DECLARES that, other than the restrictions placed on Non-public Commercial R&D Know how pursuant to paragraph 11 above, Respondent is free to use and/or dispose of any of its R&D Know how, including but not limited to clinical trials and clinical study data and information, in any manner it deems appropriate. Nothing herein, however, shall be construed to limit Claimants' ownership of the Ferrlecit health registrations upon transfer.

14. ORDERS Respondent to provide, and/or cause its Affiliates and/or Sublicensees and/or Subdistributors to provide to Claimants at no cost by no later than June 1, 2009, to the extent existing, all of the following commercial information, which Claimants can use in perpetuity:

    a. List of targeted nephrologists in Respondent's call database and records indicating results of calls made in last 12 months;

    b. List of clinical, academic and commercial consultants used in relation to the development, marketing and promotion of Ferrlecit;

and decides to dismiss all other and further claims of Claimants in relation to the transfer of commercial information.

15. DECIDES to reject Claimants' claim for an order that Respondent's withdrawal of its counterclaim for clientele indemnification is with prejudice.

16. DECIDES to reject Respondent's claim for a declaration that Claimants' right to use the regulatory information provided under item 2 of the agreement for an award on consent submitted on 14 April 2009 is restricted to the United States and Canada.

17. DECLARES that Claimants shall bear CHF 350,000.00 of the costs of the arbitration fixed by the Arbitral Tribunal at CHF 700,000.00, and that Respondent shall bear CHF 350,000.00 of those costs.

18. DECLARES that Claimants and Respondent shall each bear their own legal and other costs incurred in the arbitration.

19. DECIDES to dismiss Claimants' and Respondent's corresponding requests for reimbursement of their costs incurred for the arbitration.

20. DECIDES to dismiss all other and further substantive and/or procedural claims, requests and motions which Claimants and Respondent put forward in these proceedings.

_____
United States District Judge